559 So.2d 821 (1990)
STATE of Louisiana, Plaintiff-Respondent,
v.
Charles Terry HEBERT, Defendant-Relator.
No. K89-548.
Court of Appeal of Louisiana, Third Circuit.
March 1, 1990.
Writ Denied April 5, 1990.
*824 Stewart M. Thomas, Thomas & Cassidy, Jennings, Kenneth Michael Wright, Lake Charles, for defendant-relator.
Richard P. Ieyoub, Dist. Atty., Beth Conrad, Asst. Dist. Atty., Lake Charles, for plaintiff-respondent.
Before GUIDRY, KNOLL and ROBERTS[*], JJ.
KNOLL, Judge.
We granted this writ to determine the correctness of the trial court's ruling denying the motion to suppress the results of a blood alcohol test. Relator, Charles Terry Hebert, was indicted with two counts of vehicular homicide, violations of LSA-R.S. 14:32.1. Relator assigns as error: (1) the trial court's failure to conclude that relator was not under arrest when the blood sample was drawn; (2) the trial court's failure to conclude that the current Department of Public Safety regulations regarding blood alcohol analysis are insufficient to insure the integrity, accuracy and reliability of the chemical test; and (3) the trial court's failure to conclude that the State did not strictly comply with the promulgated regulations. We affirm.

FACTS
On December 5, 1988, the Calcasieu Parish Sheriff's Office received a call concerning a disabled vehicle on the shoulder of I-210 in the eastbound lane of the Missouri Pacific overpass in Lake Charles. At approximately 11:30 p.m., Calcasieu Parish Sheriff Deputies Doug Poole and Randall Ball observed a vehicle on the shoulder of the I-210 overpass and stopped to render assistance. As Deputy Poole approached the vehicle, he observed two silhouettes approximately 25 feet in front of the stalled vehicle. After realizing that the silhouettes were two persons lying on the roadway, Deputy Poole radioed for assistance and checked each victim for a pulse. Both victims were dead.
As Deputy Poole was walking back to his patrol car, several people informed him that a white vehicle, which was several hundred feet ahead, had crashed into a chain link fence adjacent to the highway. Hebert was found inside the vehicle and was transported by ambulance to a local hospital.
*824 At the hospital, Officer Ray Laviolet of the Lake Charles Police Department (LCPD) read the Miranda[1] rights to Hebert. Hebert was coherent and indicated that he understood his rights. Then, Officer Laviolet placed a copy of the form entitled "Rights Relating to Chemical Test for Intoxication" on Hebert's chest for him to read along. Since Hebert did not have his reading glasses and could not read the form, Officer Laviolet retrieved the form and then read the entire form to Hebert. Hebert refused to sign the form and asked to telephone his attorney.
Officer Laviolet explained that since there were two fatalities involved in the accident, Hebert could not refuse to submit to the blood test. Officer Laviolet instructed the emergency room physician, Dr. Marcus L. Pittman, III, to draw the blood samples from Hebert, using the blood alcohol kit furnished by the Louisiana State Police. The blood samples were sealed and transported directly to the evidence room of the LCPD. The results of the blood analysis showed that Hebert had a blood concentration of .15. Relator was subsequently indicted with two counts of vehicular homicide, in violation of LSA-R.S. 14:32.1, and possession of marijuana, in violation of LSA-R.S. 40:966(C) & (D).

DWI ARREST
Hebert contends the trial court erred in concluding that he was under arrest when the blood samples were drawn. He argues that he was not placed under arrest until December 7, 1988. Specifically, Hebert argues that the State failed to strictly follow LSA-R.S. 32:666(A); therefore, results of the blood alcohol test must be suppressed.
LSA-R.S. 32:666(A) provides in pertinent part:
"A. A person under arrest for a violation of R.S. 14:98 or any other law or ordinance that prohibits operating a vehicle while intoxicated may not refuse to submit to a chemical test in any case wherein a traffic fatality has occurred or a person has sustained serious bodily injury and the person under arrest has refused or is unable to participate in a field sobriety test." (Emphasis added.)
LSA-C.Cr.P. Art. 201 defines "arrest" as:
"Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him."
In State v. Thibodeaux, 414 So.2d 366, 368 (La.1982) our Supreme Court stated: "[w]hether a person has been taken into custody, detained or deprived of his freedom in a significant way must be decided by an objective test. Neither the defendant's subjective impression nor the formality of an official arrest will be determinative of the issue of his claimed illegal detention." (Citations omitted.) See also State v. Sherer, 354 So.2d 1038 (La. 1978). Rather, the proper inquiry is whether the person, in view of the circumstances, is prevented from exercising his liberty for more than a transitory moment. Once there is an extended restraint on one's liberty, that person is under arrest. State v. Freeman, 503 So.2d 753 (La.App. 3rd Cir. 1987).
In the case sub judice, the record shows that in the early morning hours of December 6, 1988, Hebert was read his Miranda rights at the hospital by Officer Laviolet of the LCPD. Officer Laviolet testified that when he read Hebert his rights, Hebert was coherent and indicated that he understood his rights. Hebert testified that he understood his Miranda rights. Officer Laviolet proceeded to inform Hebert of his rights regarding a chemical test for intoxication. Officer Laviolet testified to reading the rights form to Hebert because Hebert "didn't want to cooperate too much". Hebert testified that he attempted to read the form, but he could *825 not because he was 48 years of age, did not have his glasses on, and he "couldn't get passed [sic] the first line." Hebert denies that Officer Laviolet read the form to him. Hebert refused to sign the rights form and said he wanted to talk to his lawyer. Officer Laviolet informed Hebert he could not refuse to submit to the test since fatalities were involved and denied Hebert's request for an attorney until after his blood was drawn. The trial court denied the motion to suppress (without reasons), so it is apparent that the trial court believed Officer Laviolet when it resolved the credibility issue as to whether Officer Laviolet read Hebert his rights regarding the chemical test for intoxication. We defer to the trial court's determination of this credibility issue since it is in the best position to view the witnesses as opposed to our review of a cold record. The record before us does not support that we should second guess the trial court and reverse this credibility determination. Moreover, the jurisprudence is firmly established that if there is conflicting testimony as to a factual matter, the question of the credibility of the witness is within the sound discretion of the trier of fact. State v. Toussaint, 502 So.2d 599 (La.App. 3rd Cir.1987). Therefore, we find that Officer Laviolet did read Hebert his rights regarding the chemical test for intoxication.
In reviewing the form, "Rights Relating To Chemical Test For Intoxication", the first paragraph states:
"You are under arrest by a law enforcement officer who has reasonable grounds to believe that you were operating a vehicle while intoxicated. The law (R.S. 32:661-669) now will require you to take a chemical test or tests to determine the alcoholic content and/or the presence of any abused or illegal controlled dangerous substance in your blood, breath, urine or other bodily substances."
The form clearly advised Hebert that he was under arrest for operating a vehicle while intoxicated and that "the law now will require you to take a chemical test ... to determine the alcoholic content ... in your blood...." Since two fatalities were involved in this DWI, Officer Laviolet would not let Hebert refuse to take the test, despite the fact that Hebert was uncooperative and wanted to talk to his lawyer first. We find under the facts presented herein, Hebert was placed under arrest for the purpose of drawing his blood to determine the alcoholic content in his blood in connection with a DWI offense. The fact that Hebert was placed under arrest by reading the form to him is sufficient. At that point he knew he was under arrest, could not refuse to submit to the drawing of his blood and could not talk to his lawyer first. Officer Laviolet testified if Hebert attempted to leave, he would have restrained Hebert. The fact that his driver's license was not then taken is immaterial for the purpose of determining if he was under arrest for the purpose of drawing his blood. We find significant restrictions of Hebert's liberties under the circumstances presented herein, i.e., he was injured and hospitalized, that a lawful arrest for DWI was executed for the purpose of drawing his blood to determine the alcoholic content. Hebert argues that he was not arrested until two days later, when he was discharged from the hospital and immediately reported to the LCPD with his two attorneys. We agree with Hebert that he was arrested on December 7, 1988, two days later, but for the purpose of charging him with two counts of vehicular homicide, possession of marijuana, and again for DWI. This argument overlooks the fact that Hebert's first arrest on December 6, 1988, was for the purpose of drawing his blood to determine the alcoholic content in connection with a DWI offense. Accordingly, we find the trial court properly denied the motion to suppress on the grounds that Hebert was not under arrest. Therefore, this assignment of error is without merit.

ADEQUACY OF THE JUNE 1988 REGULATIONS FOR BLOOD TESTS
Relator's next argument is that the newly promulgated blood test regulations are not sufficient to insure the integrity and reliability of a chemical test. Specifically, he contends: (1) there are no regulations *826 covering handling, storage, and preservation of the sample from the time it is drawn until it is analyzed; (2) there are no regulations covering storage and preservation of the sample after it is analyzed so that it can later be re-analyzed; (3) there are no regulations requiring certification or periodic inspection of specific gas chromatographs by the Department of Public Safety (DPS) as is currently required for breath testing devices; (4) the regulations do not require routine maintenance and inspection of the gas chromatograph by DPS personnel as is required for breath testing machines; (5) the regulations do not require certification and spot-checking of chemicals used to calibrate gas chromatographs; (6) the regulations do not require certification and spot-checking of chemicals used to run a system blank analysis, a "known sample" analysis, and preparation of the test sample for analysis; (7) the regulations do not require the blood alcohol analyst to keep an accurate and detailed test log; and (8) the regulations require only a single point calibration as opposed to a five point calibration which would insure greater accuracy.
In State v. Rowell, 517 So.2d 799, 800 (La.1988), our Supreme Court recognized that:
"This court has repeatedly recognized the importance of establishing safeguards to guarantee the accuracy of chemical tests used in criminal prosecutions. In order for the state to avail itself of the statutory presumption of a defendant's intoxication arising from a chemical analysis of his blood under La. R.S. 32:662,[2] it must show that the state has promulgated detailed procedures which will insure the integrity and reliability of the chemical test, including provisions for repair, maintenance, inspection, cleaning, certification, and chemical accuracy." (Footnote added.)
The court then held that the guidelines for chemical tests of blood for intoxication were not sufficient to insure the test's integrity or accuracy. The court noted on page 802 the following inadequacies:
"The regulations concerning the qualifications of a person seeking a permit to conduct blood analysis are insufficient because they do not specify the type of proficiency testing required. Moreover, the regulations do not provide for the repair, maintenance, or inspection of the gas chromatograph. Although the chemist who performed the blood analysis in the instant case testified that he was able to perform some repairs, the regulations do not require a person seeking a permit to have such skills. In view of the chemist's testimony that alcohol can be manufactured in the blood sample if it is not properly preserved, the regulations do not sufficiently provide for the preservation of the blood sample. Finally, the regulations are not sufficient to insure the accuracy of the chemicals used to calibrate the gas chromatograph. Accordingly, we agree with the court of appeal that the state failed to meet its burden of proving that the regulations insured the integrity and reliability of blood alcohol analyses because they did not contain provisions for repair, maintenance, inspection, cleaning, certification and chemical accuracy.7" (Footnote omitted.)
In June of 1988, the DPS promulgated a new set of regulations for the chemical test of blood for intoxication. These regulations appear to have been made in direct response to the Rowell decision. It thus seems that a comparison between the old *827 and new rules, and the mandates of Rowell, would be helpful.
Rowell first noted that no proficiency testing was specified for persons seeking a permit to conduct a blood alcohol analysis. The old regulations provided that:
".001. PERMITS
All persons seeking to be authorized to conduct blood analysis shall:
Section 1. Make application to the Department of Public Safety and Corrections Crime Lab for permit or renewal of permit.
Section 2. Have a Bachelor of Science in chemistry, physics, biology, zoology, medical technology, or a related field.
Section 3. Conduct proficiency testing set up by the State Police Crime Laboratory.
Section 4. Permits shall be effective when issued for a period of five years from the date inscribed thereon."
Under the new regulations, the procedures for obtaining a permit and certification to perform a chemical test of blood for intoxication are much more substantial. These regulations require that:
"§ 553. Certification; Renewal of Certification; Suspension, Revocation or Cancellation
A. All persons seeking certification to conduct blood alcohol analysis shall:
1. make application to the Louisiana State Police Crime Laboratory;
2. successfully complete an accredited college or university course of study which meets all academic requirements for at least a bachelor's degree and receive a degree in medical technology or one of the chemical, physical, or biological sciences;
3. successfully complete a course of at least 24 hours instruction concerning blood alcohol testing conducted by the Louisiana State Police Crime Laboratory. This course shall include, but not be limited to the following: procedures, pharmacology and physiology of alcohol, theory of gas chromatography, maintenance, repair, and inspection of instrumentation, preparation and analysis of blood samples;
4. conduct certification testing set up by the Louisiana State Police Crime Laboratory.
B. Certificates may be renewed upon completion of each of the following:
1. application to the Louisiana State Police Crime Laboratory;
2. successful completion of a refresher course given by the Louisiana State Police Crime Laboratory or any other agency approved by the Louisiana State Police Crime laboratory;
3. successful analysis of four certification samples as stated in § 559.
C. Certification and renewal thereof shall be valid for a period of two years from the date of issuance. D. Failure to adhere to any of the rules and regulations set forth herein, upon establishment of said failure may result in suspension, revocation or cancellation of the certification.

* * * * * *
§ 559. Certification Testing
An applicant for certification to perform blood alcohol analysis shall submit for certification testing conducted by the Louisiana State Police Crime Laboratory.
A. Applicant shall perform analysis on four unknown samples of whole blood at least three of which shall contain ethyl alcohol percentages of between .01 and .30g percent. The fourth sample may contain ethyl alcohol within previously stated values, other volatile compounds or a sample free of any volatile compounds.
B. The stock solution used to prepare certification testing shall be from a sealed bottle of 200 proof pure anhydrous grade ethyl alcohol diluted to a concentration of 5g/100ml with deionized water. This will then be diluted further with alcohol free blood to obtain concentrations within the range listed in the previous section.
C. Blood samples shall be placed in an approved blood alcohol kit and a sample of each unknown shall be tested and retained by the Louisiana State Police Crime Laboratory.

*828 D. The samples will then be sent to each applicant for alcohol analysis.
E. The applicant shall submit the results of analysis, the completed application, the procedure used for analysis, and all paperwork generated in the process of determining the blood alcohol values to the Louisiana State Police Crime Laboratory.
F. Results must be within a value of ± 10 percent of known values. In addition, paperwork will be reviewed to determine that all procedures were in compliance with these rules and regulations.
G. After review of all paperwork and if results are within accepted ranges, the applicant will be certified as a blood alcohol analyst and will be issued a blood alcohol analyst certificate. This certificate will be valid for a period of two years."
The new regulations therefore make an additional education requirement in that an applicant must successfully complete the course mandated by La.Reg. § 553(A)(3). Renewal of permits now requires that an applicant complete a refresher course taught by the State Police Crime Lab. Applicants for both permits and renewals are required to perform analysis on four unknown samples of whole blood, three of which must contain alcohol percentages within .01 and .30g percent. The new rules set forth standards for the stock solution used in preparing for certification testing (La.Reg. § 559[B]). The applicant's analysis must then be within 10% of the Louisiana State Police Crime Laboratory's determination of the alcohol values. It therefore seems that the new regulations sufficiently provide for proficiency testing before a permit is issued or renewed.
Rowell also found the regulations inadequate because they did not provide for the repair, maintenance, or inspection of the gas chromatograph. Additionally, the case noted that no skill requirements existed for a person performing repair, maintenance, or inspection. In connection with this requirement, Hebert urges that the new regulations are insufficient because they do not require certification, periodic inspection, or routine maintenance of the gas chromatograph by personnel of DPS, as is mandated for breath testing devices. As was previously shown, § 553 of the new blood analysis guidelines requires that a person seeking a permit complete a 24 hour course which includes instruction on maintenance, repair, and inspection of instrumentation. The rule also provides for the class to cover the theory of gas chromatography. According to new § 555(A), "The certified analyst shall inspect instrumentation and equipment immediately before analysis is begun to insure that the instrument is operating properly and that test results will be accurate and within the tolerances indicated below". § 555 then goes on to state the controls to be used in insuring the accuracy of the testing procedures. This is done by running a blood sample with a known alcoholic content through the gas chromatograph.
§ 557 provides that:
"Maintenance, Repair and Inspection
Maintenance, repair and inspection of a gas chromatograph may be performed by a certified blood alcohol analyst. This may include but not be limited to cleaning, replacing septums, changing columns, checking gases and flow rates, adjusting temperature settings, and any other routine checks that are deemed necessary for accurate performance. Following each maintenance or repair, inspection of the instrument shall include running a known alcohol standard to insure that the instrument is in proper working order.
A log book listing all repair work, maintenance and inspection shall be kept and will be available for inspection. The minimum information required in the log book shall state the date, time, nature of work, and name of person(s) performing task."
Therefore, the new requirements provide for a certified analyst to have the skills needed to maintain, inspect, and repair gas chromatography equipment, that an inspection be done immediately before an analysis to insure that all test results are within acceptable parameters, and that maintenance *829 includes certain procedures. The fact that the machine is inspected before every analysis would seem to vitiate any need for periodic inspection and maintenance. Mr. Patrick Ieyoub, Director of the Lake Charles Crime Laboratory, testified that the inspection performed under § 555(A) includes a maintenance check and that an outside specialist inspects the gas chromatograph once every six months. It thus seems that the new regulations meet this aspect of Rowell.
Rowell next ruled that the regulations concerning blood tests were inadequate because of their failure to provide for preservation of the blood sample. Testimony in Rowell proved that absent a preservative in the sample's vial, certain enzymes could produce alcohol, thus resulting in a blood alcohol reading higher than that which was actually present in the suspect. Regulation § 555(G)(1) now provides that:
"All kits approved by this department shall contain the necessary preservatives to insure stability of the sample as provided by the manufacturer and contain no component which will interfere with the ethyl alcohol analysis of blood."
The new regulations thus provide for the preservative mandated by Rowell.
Rowell also found that the former regulations were not sufficient to insure the accuracy of chemicals used to calibrate the gas chromatograph. This finding apparently resulted from testimony that the chemicals used to calibrate the gas chromatograph were not spot-checked for standard quality and that, if the calibration standard was off, an error would occur in the actual blood analysis. Hebert argues that the new regulations are also inadequate in this regard. Though the new procedures do not require routine spot-checks on the chemicals used in calibration, they do direct that an inspection of instrumentation and equipment be performed to insure that test results will be accurate and within a certain range (§ 555). In each analysis, the inspection is to be followed by certain controls to help insure accuracy. These controls are performed in order to calibrate the instruments. That is, certain commercially prepared samples with known percentages of alcohol are run through the gas chromatograph to insure that the machine is giving an accurate reading. Both the old (§ 002) and new (§ 555) regulations require a system blank analysis. Mr. Ieyoub testified that his procedure included a system blank analysis: "Well, it's distilled water without the presence of any alcohol, any known alcohol, ethyl alcohol." Next, a reference or control blood sample with an alcohol content of .05 to .40g percent is analyzed. The result of the analysis must be within ± 0.01g percent of the known value, or else the test of the actual specimen will not be valid.
The controls are apparently set so that if the results of an analysis of a commercially prepared standard is greater than ± 0.01 percent from the known value, an analyst will know that some problem has arisen. Such controls would seem to eliminate any need for spot-checking. Hebert's expert, Dr. Emile M. Laga, makes much of the fact that the prepared standards are not spot-checked or rechecked after they have been received by the laboratory. However, if the standards' percent of alcohol differs from that proclaimed by the manufacturer, it would seem that the pre-analysis testing by the gas chromatograph would give a result reflecting such a discrepancy, thus warning the analyst that some error is present. On cross, Mr. Ieyoub testified concerning the sensitivity of the gas chromatograph, as follows:
"Q. Would you agree with me then, Mr. Ieyoub, that an error somewhere along the way in the process of collecting the sample, analyzing the sample, some machine malfunction, some problem with the chemicals or calibration could substantially effect [sic] the results because we're dealing with such measurement of such small quantities?
"A. No, sir. I don't foresee that because the chromatograph is such a technical instrument and it's so efficient. It is designed specifically for small quantities and we do two controls. We do a calibration and then we do another outside *830 blood control. We do replicate analyses so when they come in with

* * * * * *
So I mean if we're talking about getting down to .003 grams, which is three milligrams per hundred or three thousandths of a gram per one mill. I mean it's very specific. I don't forsee these errors. Specifically, that is the whole purpose of ironing out any type of possible error is to do the replicate analyses and to standardize and to use other outside blood controls. I know there are certain instruments that go into picograms. Picograms or nanograms. Or ten to the ninth, ten to the minus ninth. I mean we're talking practically invisible to the eye. I mean it is invisible. But when you talk about molecular ions, that's exactly what you're analyzing. You're analyzing molecules. So I don't foresee an error like this."
Mr. Ieyoub stated that the blood controls are used to make sure that the calibration is correct. While on cross, the following exchange took place between Mr. Ieyoub and defense counsel concerning spot-checking the known controls:
"Q. The internal standards, the whole blood that you used for the known sample, the distilled water, the n-propanol alcohol, none of that is ever spot checked [sic], is it?
A. No, it's not.
Q. And you don't know whether these kits themselves, the BD kit is ever spot checked [sic].
A. I don't understand the meaning of the spot test, exactly what you're talking about. To ensure that there is ethyl alcohol there?
Q. That they are what they purport to be. They're not spot checked [sic], are they?
A. Well, I can tell you this. When we run an ethyl alcohol standard from E. Merck & Darmstadt, and it comes out at a specific retention time, then it's got to be ethyl alcohol. I know that there's ethyl alcohol in there. Now, the label says it contains a certain milligram of ethyl alcohol. I believe at some point we just have to take somebody's word for it. I mean that's like saying, you know, how do you know you're driving a Buick? Because it's got the Buick label on it. You have to take somebody's word at some point."
It thus seems that, if a sample contains an amount of ethyl alcohol other than that labeled, then this discrepancy would become apparent when the components are measured in the gas chromatograph. (See Rowell, 517 So.2d at 801). Thus, spot-checking appears to be unnecessary.
Hebert's concern over the lack of spot-checking seems mainly due to the type of calibration performed by the lab. Mr. Ieyoub stated that the machine was calibrated once and that a blood control was performed thereafter to make certain that the calibration was correct. The defense expert, Dr. Laga, testified as follows concerning a five point calibration:
"Q. All right. Can you explain to the Court how an error or mistake in the process of calibration would affect the accuracy of the test?
A. Let me first define calibration. I define calibration as introducing into the machine a series of alcohol solutions at different concentrations like .05, .1, .15, .20; in other words, trying to bracket the range you can encounter in blood determinations, and that is what is called calibration. What was referred to here previously was not calibration. That was a single point standardization, which is trying to check that curve that I'm pulling up.
Q. Specifically,
A. So there are errors involved when you use a single point calibration versus always trying to completely encompass the full range of what you're trying to measure. The reference specimen of the standard that is introduced at a single point, or a facsimile type of calibration, is usually put about .1 or .15, which is completely out in the cold where you are when your specimen, for instance, has a count of .3 or .4 grams per 100 mil of blood.

*831 Q. Were you in court when Mr. Ieyoub testified?
A. Yes.
Q. All right. Did you hear him describe his efforts to calibrate this machine?
A. Yes.
Q. As a forensic pathologist, do you think that that's legally sufficient?
A. As a forensic pathologist, I have to say that most laboratories that have to testify in court would much rather have a complete five point calibration done at any one time rather than a single point calibration, which is really subject to errors. You are completely dependent on the manufacturer's statement that so much alcohol is present in that one single vial of alcohol. You have a better chance when you calibrate five points, covering the entire range of what you want to measure, rather than a single point that possibly may be erroneous on the manufacturer's side. There have been recalls on complete lots of calibration standardization reference solutions by a manufacturer that in retrospect caused very serious errors because you only test out one point over an entire scale of measurement. The other problem is that thepreferentially, a number of states has been done, whatever lot is being gotten from a manufacturer undergoes prior testing at a central laboratory, like the one we have in Baton Rouge, and only then is being released for regional or satellite laboratories to be used and it's approved, so it has a double layer of confidence. First the manufacturer claims, that's being cross checked [sic] by the central laboratory of the state, and only then being released as being a valid procedure for a single point calibration."
It thus appears that the court was presented with two different views as to whether or not spot-checking was needed to make sure that the gas chromatograph is giving an accurate reading of a sample's blood alcohol content. Though Mr. Ieyoub was not offered as an expert, his testimony showed that he has extensive knowledge and training in gas chromatography and its operations. He has been certified as a blood analyst by the Louisiana State Police Crime Laboratory. By the ruling of the trial court, it appears that the trial court accepted the conclusions of Mr. Ieyoub rather than Dr. Laga.
A fact finder is free to accept or reject the conclusions of an expert witness. State v. Pruitt, 482 So.2d 820 (La.App. 4th Cir.1986), writ denied, 488 So.2d 1018 (La. 1986). In State v. Sherer, supra, the Louisiana Supreme Court held that although there was no formal acceptance, the court had apparently considered a police officer as an expert in accident reconstruction because of his knowledge and experience. It has been consistently held that the competence of an expert witness is a question of fact to be determined within the sound discretion of the trial judge. His ruling on the qualifications of expert witnesses will not be disturbed in the absence of manifest error. State v. Sherer, supra; La.C.E. art. 702, Comment (d). It thus appears that, as a judge may accept or reject expert testimony, he may, in his discretion, likewise accept one expert opinion over another. Therefore, the judge's decision to accept Mr. Ieyoub's opinion that the inspection and efficiency of the gas chromatograph makes spot-checking of chemicals unnecessary was within his sound discretion. In addition to the controls which take place before the actual analysis, both regulations provide that a replicate analysis be performed after the specimen is tested. However, the former regulations only required that the replicate analysis be performed in order to minimize the possibility of undetected errors, while the current guidelines require that the replicate analysis be performed so that it eliminates such a possibility. (§ 555[D]). Mr. Ieyoub testified that the purpose of replicate analysis is to eliminate errors such as that which could be produced by faulty calibration standards. Mr. Ieyoub stated on cross that in preparing solutions for the gas chromatograph, a certain amount of measurement by sight is required. When asked if a slight error in the measurement would affect any results, Mr. Ieyoub replied that *832 the gas chromatograph "... would show the difference in replicate samples, so much that I'd know that I'd made that error." It thus seems that any problem resulting from faulty chemicals used in calibration or in preparing test samples would be obvious from the control samples or the replicate testing. Therefore, the evidence shows that the additions made to the new regulations adequately encompass the problems that spot-checking is presumed to solve. Therefore, we find for these reasons, that the new safeguards comply with the mandate handed down in Rowell.
Relator also contends that the regulations for an analysis of blood are inadequate for reasons other than those addressed in Rowell. Relator points to Dr. Laga's testimony regarding the absence of any regulations covering the handling, storage, or preservation of a subject's sample from the time it is drawn until it is analyzed. Dr. Laga testified that the storage instructions provided in the blood kits should be adopted as regulations. Dr. Laga stated that the manufacturer's instructions provide that the sample should be refrigerated at all times except during transport.
LSA-R.S. 49:966(C) states that "The courts of this state shall take judicial cognizance of rules promulgated in the State Register under the provisions of this Chapter." This court has held that this provision allows the court to take judicial notice of the rules and regulations set forth by the Louisiana Department of Public Safety in regard to intoxication tests. State v. Corkran, 448 So.2d 1346 (La.App. 3rd Cir. 1984), writ denied, 450 So.2d 970 (La.1984). It is submitted that by taking judicial notice of the regulations, the court is in turn acknowledging their validity. Otherwise, it appears that the State would be forced to continually re-try the merits of the regulations every time a defendant moves to suppress. This reasoning is strengthened by the fact that the State generally need only show that the rules have been strictly complied with in order to take advantage of the irrebuttable presumption provided in LSA-R.S. 32:662(A)(1)(c). Furthermore, it is submitted that the judicial branch may rely upon the other branches of government better able to investigate the most scientifically accurate standards for determining the appropriate guidelines in chemical tests for intoxication. It therefore seems that the burden of proving that the present regulations are not sufficient falls upon the defendant.
Here, relator has not presented evidence as to what problems could occur from a sample not being refrigerated. The only time Dr. Laga discussed refrigeration is in the context of long-term storage, where some of the effects of refrigeration are apparently detrimental. In addition, relator failed to introduce a copy of the instructions into evidence. It therefore appears that defendant has failed to prove that the rules are inadequate because they do not provide for refrigeration prior to analysis. It should also be noted that, in the instant case, Hebert's sample was immediately refrigerated until analysis. Hebert was therefore not prejudiced by the lack of a regulation and, under LSA-C. Cr.P. art. 921, no reversal is obtainable.
Relator's next contention is that there are no regulations covering storage and preservation of the sample for purposes of re-analysis. As pointed out earlier, the regulations now require that all kits used in blood analysis contain a preservative to insure the stability of the sample. (§ 555[G][1]). Further, § 555(G)(2) states that "Following analysis, the evidence will be stored for a period of one year by either the testing facility or the submitting agency and then may be destroyed." Dr. Laga testified that these provisions are inadequate because they do not include the manufacturer's instructions that the tube containing the blood sample be inverted five or six times to insure that the preservative mixes with the blood, nor do they provide that the sample be refrigerated. Dr. Laga does not testify that inversion less than five or six times may result in erroneous readings, but that it simply does not meet the manufacturer's instructions. He fails to note whether inverting the tube two or three times would not properly mix the preservative with the blood. Dr. Laga *833 states that precipitation in the tubes almost suggests that the mixing was not complete. However, Dr. Laga ran no tests to prove this theory. Additionally, Dr. Laga was extremely uncertain as to the effects of such a mixing, as he only testified that the results may be affected to some point. Dr. Laga testifies that storing a blood sample at room temperature, rather than refrigerating, may cause new alcohol to be produced by a bacterial and yeast process. However, Dr. Laga also stated that preservatives are required so that no alcohol will be produced. It thus seems that the requirement of preservatives does away with any need for a regulation mandating refrigeration.
Next, relator urges that the regulations are deficient because they do not require the blood analyst to keep an accurate and detailed test log. Dr. Laga testified that a test log is needed: 1) to verify the identity of the specimen; 2) to verify the quality of the tubes in which the specimen is stored and preservatives are used; 3) to establish a chain of custody; 4) to verify the status of the gas chromatograph; and 5) to record the results of the machine's calibration and the replicate analysis on the specimen.
First, our courts have long held that the connexity of physical evidence to a specific case may be shown by actual identification or by establishing the custody of the object from the time it was obtained to the time it was offered into evidence. State v. Sweeney, 443 So.2d 522 (La. 1983). For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case. A preponderance of the evidence is sufficient to prove connexity. State v. Sweeney, supra; State v. Sherer, supra; State v. Wilson, 517 So.2d 865 (La.App. 3rd Cir.1987). It therefore seems that a test log would do no more to insure the integrity and reliability of a blood test, as either identification or chain of custody are already required by law. Second, the quality of tubes and the presence of preservatives are mandated by regulation. La.Reg. § 555 and 561. Adherence to these provisions must be proven at trial in order to show that the State strictly complied with the regulations, as is required by State v. Tanner, 457 So.2d 1172 (La.1984). Production of a test log would therefore be a needless addition. Third, La.Reg. § 557 already requires that a log book listing all repair work, maintenance, and inspection be kept. The book must show the date, time, nature of work, and the name of the person performing the task. It thus appears that the rules already provide for such a log. The fourth argument would appear to be solved by the fact that the State must show that a gas chromatograph is inspected to insure proper operation and accurate test results. La. Reg. § 555(A). Lastly, the State is already required to prove that the results of the machine's calibration are within a certain range. La.Reg. § 555(B). Since the State must show that replicate analysis is done in a way to eliminate undetected errors, proof of the actual measurement would seem unnecessary. La.Reg. § 555(D). It thus seems that this argument is meritless.
Finally, Hebert contends that the provisions are inadequate due to the lack of a regulation requiring a five point calibration. He bases this argument on the belief that a five point calibration is more accurate than a single point. Relator's expert testified that a five point calibration helps to determine whether or not a commercially prepared standard has the alcoholic content which the manufacturer claims. As was previously discussed, the new procedures regarding calibration controls would show any discrepancy which would result from a manufacturer's error in determining a standard's alcoholic content. Mr. Ieyoub testified that the gas chromatograph is a technical instrument which would show such errors. Further, the provision for replicate testing now requires that the testing be done so that no such errors will go undetected. It therefore seems that single point calibration is sufficient, given the totality of the regulations, the controls mandated, and the technical nature of the gas chromatograph.

STRICT COMPLIANCE WITH THE REGULATIONS
In this argument, relator contends that the State failed to prove that the blood test *834 was carried out in strict compliance with the regulations promulgated by DPS. Specifically, he argues that the State failed to prove 1) that a preservative was used to insure the stability of the sample, as mandated by La.Reg. § 555(G)(1); 2) a proper chain of custody of the blood sample; 3) that the gas chromatograph was timely inspected, and that written procedures were approved by the Louisiana State Police Crime Lab; and 4) that true replicate analysis was performed.
LSA-R.S. 32:663 states, in pertinent part, that:
"Chemical analyses of the person's blood, urine, breath or other bodily substance, to be considered valid under the provisions of this Part, shall have been performed according to methods approved by the Department of Public Safety and by an individual possessing a valid permit issued by said department for this purpose."
The Louisiana Supreme Court has consistently held that the State must show strict compliance with the promulgated procedures. Absent strict compliance, chemical test results which would cause a presumption of intoxication must be suppressed, as their admission would be so prejudicial to a defendant that a resulting conviction could not stand even if there is other evidence of intoxication. State v. Rowell, supra; State v. Tanner, supra; State v. McElroy, 553 So.2d 456 (La.1989).
We first address the third argument under this assignment. § 555(A) clearly states that a certified analyst shall inspect instrumentation and equipment immediately before an analysis is begun to insure that the instrument is operating properly. As was shown in the previous section, this inspection seems to be an integral part in insuring the integrity of the test, given that no routine inspection or spot-checking of chemicals is required.
Hebert contends that the State did not have a certified analyst inspect the machine itself, i.e., the gas chromatograph, immediately before the analysis; therefore, the State did not comply with the regulations. We find Hebert's argument is confusing § 557 concerning maintenance, repair and inspection of the gas chromatograph, with § 555 concerning the immediate inspection of instrumentation and equipment used by the certified analyst before the analysis begins. § 557 is aforestated in full under relator's second assignment. § 555 reads as follows:
"Certified Techniques of Analysis
A. The certified analyst shall inspect instrumentation and equipment immediately before analysis is begun to insure that the instrument is operating properly and that test results will be accurate and within the tolerances indicated below.
B. The methods approved for alcohol analysis of blood are:
1. Gas ChromatographyHeadspace sampling with internal standard.
2. Gas ChromatographDirect injection with internal standard.
C. Procedures shall include the following controls in conjunction with each batch of samples analyzed.
1. a system blank analysis;
2. analysis of a reference or control blood sample of known alcohol content within the range .05 to .40g percent, the result of which analysis must coincide with the known blood alcohol value of the reference specimens ± 0.01g percent if validity is to be assigned to the results for the batch analyzed.
D. Replicate analyses shall be performed in order to eliminate the possibility of undetected errors.
E. Results shall be expressed in terms of percent w/v (g percent) that is, grams of alcohol per 100 milliliters of blood rounded downward to the second decimal place, for example, 0.237g percent shall be reported as 0.23g percent.
F. Analytical procedures for determining the concentration of alcohol in the blood shall meet the following requirements.
1. The accuracy of the procedure shall be such as consistently to attain results within ± .01g percent of the known value over the range .05 to 0.40g percent in analyses of commercially prepared *835 standards of known alcohol concentration.
2. The precision of the analysis shall be such as consistently to attain a reproducibility not greater than ± 0.005g percent of the mean value in replicate analysis.
3. The values yielded by the procedure in analyses of alcohol-free reagents consistently shall be not greater that ± 0.01g percent.
4. Procedures for the analysis of whole blood from living and post mortem subjects shall differentiate ethyl alcohol from all other substances.
G. Blood drawn for the purpose of determining the alcoholic content therein shall have been taken with the contents of a sealed "B-D Blood Alcohol Kit" Number 4990 or 4991 (manufactured by Becton-Dickinson Division of Becton-Dickinson and Company) or a similar blood collection kit approved by the Louisiana Department of Public Safety and Corrections. "B-D Blood Alcohol Kits" or similar blood collection kits as approved will be made available to all law enforcement agencies by the Louisiana State Police.
1. All kits approved by this department shall contain the necessary preservatives to insure stability of the sample as provided by the manufacturer and contain no component which will interfere with the ethyl alcohol analysis of blood. Each approved kit must be manufactured specifically for blood alcohol determinations in living or post-mortem subjects.
2. Following analysis, the evidence will be stored for a period of one year by either the testing facility or the submitting agency and then may be destroyed.
H. Each laboratory performing blood alcohol analysis must submit to the Louisiana State Police Crime Laboratory for approval written procedures with regard to the following minimum standards:
1. Analysis must be performed on a gas chromatograph.
2. Any procedures for blood alcohol determinations as outlined in these rules and regulations shall be considered minimum standards.
3. Maintenance, repair and inspection must be in accordance with guidelines listed in § 557."
There is no dispute that Mr. Ieyoub is a certified analyst. The record shows his certification. Likewise there is no dispute, and the record supports, that the machine is checked every six months by a person from the Perkin Elmer Company. The machine is a 3920 Perkin Elmer gas chromatograph. There is no dispute that Mr. Ieyoub performed the analysis. As we appreciate relator's argument, the dispute is over whether it is mandatory that a certified analyst has to inspect the machine under § 557 before each analysis.
In response to repair and maintenance of the machine, Mr. Ieyoub testified:
"Q The repair and maintenance on the machine, how often is the machine maintained?
A It's maintained practically every time an analysis is performed. We go through a maintenance inspection of the instrument. We look for certain details to insure that the piece of equipment is operating properly. Almost on a daily basis or at least just about when we run every sample. If there is nothing to be changed, then there's nothing to be done on it."
Concerning the examination of the machine, the record shows:
"Q Would you examine that log, please, and tell me if you can, when the last time that the machine was examined prior to your using it in this case?

* * * * * *
A It had been examined on a number of occasions before I used it, and the latest wasWell, it was examined on the 14th of December, which was the day before I actually did the test. It was analyzed on the 7th of December, the 28th of November. It's just a whole different amount of dates where it was inspected.
Q And each of these inspections by a certified blood alcohol analyst?
A All except for one.

*836 Q Which one?
A On the 14th by Mr. Cornell Chaumont. He was not certified at the time, but Ms. Debbie Trahan had inspected it on the 7th."
Later on cross-examination, the following exchange took place between Mr. Ieyoub and defense counsel:
"Q According to the documentation that you brought with you to court today, according to the certificate, you ran the test. Am I correct? You ran the test on December the 15th.
A Yes, sir.
Q And according to the log, the maintenance and repair log for this machine, the last time it was inspected or repaired or any work was done to it was on December the 14th?
A Yes, sir.
Q And it was not done by you?
A No, sir, it wasn't.
Q It was done by a person that is not a certified blood alcohol analyst?
A That's right."
The record is clear that Mr. Ieyoub strictly complied with all of the regulations of § 555. Before he analyzed Hebert's blood, he calibrated the machine. The record shows:
"Q When you ran these four samples, Mr. Ieyoub, you actually calibrated the machine once, didn't you?
A I calibrated it one time and then used a blood control after it to make sure that the calibration was correct.
Q And then you ran off four samples?
A Yes, sir. I ran a blank after the calibration or after the blood control and then I ran the samples."
It is clear from § 555 that a certified analyst is mandatory "immediately before analysis is begun" to inspect instrumentation and equipment "to insure that the instrument is operating properly and that test results will be accurate and within the tolerance indicated below." As noted from Mr. Ieyoub's testimony recited above, "It's maintained practically every time an analysis is performed. We go through a maintenance inspection of the instrument. We look for certain details to insure that the piece of equipment is operating properly. Almost on a daily basis or at least just about when we run every sample." (Emphasis added.)
From this testimony we find that the State complied with § 555 of the guidelines. The fact that the log shows that the machine was examined on December 14 by Mr. Chaumont, who was not a certified analyst at that time, does not vitiate the analysis performed on December 15 by Mr. Ieyoub. Clearly, the testimony concerning the inspection of the machine with reference to the log before the analysis would be referring to § 557 because that is the only regulation guideline that requires a log be maintained on the machine. Inspection under § 557, for the purpose of maintenance and repair of the machine does not require a certified analyst, but "may be performed by a certified blood alcohol analyst." Since may is permissive and not deemed mandatory, the inspection by Mr. Chaumont was within the regulations. Therefore, this argument is without merit.
Relator further argues that no evidence was introduced to show that the written procedure for blood testing had been approved by the State Police Crime Lab, as is required by La.Reg. § 555(H). Mr. Ieyoub stated that his lab had submitted such procedures to the State Police and that approval had been received. This evidence was unobjected to at the hearing and is therefore not subject to review. La. C.Cr.P. art. 841.
Relator's first argument on the issue of strict compliance is that the State failed to prove that a preservative was included to insure stability of the sample. (La.Reg. § 555[G][1]). He notes that the physician who withdrew Hebert's blood testified that to his knowledge, "... there are no chemicals in a blood alcohol tube." Later, the doctor stated that "... something may have been in the tube." The doctor's testimony shows that he was unfamiliar with the tubes. At one point, he testifies that several tubes did "... have something in the bottom."
*837 The record clearly shows that Dr. Pittman used the blood alcohol kit furnished by the Louisiana State Police. This is not disputed. § 555(G) requires that the blood kit shall be approved by the DPS and made available to all law enforcement agencies by the Louisiana State Police. § 555(G)(1) provides that "All kits approved by this department shall contain the necessary preservatives to insure stability of the sample..." (Emphasis added.) Whether Dr. Pittman, the emergency room doctor, is aware of DPS's requirements for the blood alcohol kit is immaterial. The determinative factor is that Dr. Pittman used the blood alcohol kit furnished by the Louisiana State Police to draw and preserve Hebert's blood sample. The thrust of relator's argument attacks the doctor's knowledge of the kit and not the kit itself. We find this argument is without merit.
Relator also argues that the State failed to prove a proper chain of custody of the blood kit from the time the sample was drawn until analysis. Specifically, he contends that the kit may have been checked out on December 10, rather than December 14, thus evidencing a period of time during which the location of the blood samples was unknown.
Chain of custody is not a requirement under the promulgated regulations. As previously shown, our jurisprudence states that chain of custody is a method of proving the connexity between demonstrative evidence and the instant case. This need only be shown by a preponderance of the evidence. It is not necessary that all possibility of alteration be eliminated for evidence to be admissible, nor must the State establish a continuous chain of custody. State v. Sherer, supra; State v. Wilson, supra. Any defects in the chain of custody go to the weight of the evidence and not to its admissibility.
In the present case, Dr. Pittman testified that he drew the blood from Hebert and transferred the samples to a police officer. This was done in the early morning hours of December 6, 1988. Statements by Officer Laviolet and Lt. Manning show that Lt. Manning was the officer who received the blood kit from Dr. Pittman. Both Dr. Pittman and Lt. Manning sealed the kit at that time. Shortly thereafter, Lt. Manning turned the kit over to Officer Gerald Houston, who was the ID officer of the Hebert case. Officer Houston then logged the kit into the LCPD's refrigerated storage facility. Officer Houston testified and identified the kit admitted into evidence as the one containing Hebert's blood sample.
The kit was next taken to the Lake Charles Crime Lab. Lt. Manning, as evidence custodian, testified that the evidence receipt for the blood sample revealed that the sample was taken to the lab on December 14, 1988. He stated that this date was written by a Sgt. Holland. Defense counsel at the hearing made issue of the fact that, on an earlier date, Lt. Manning had thought the date was December 10, 1988. Lt. Manning stated at the hearing that the date was illegible at the time he had informed defense counsel. However, Sgt. Holland later informed Lt. Manning that the date was the fourteenth and not the tenth. Corporal Karl Gillard testified that he transported the sample from the LCPD's refrigerator to the Crime Lab. He stated that he thought this was done on December 15, 1988. Corporal Gillard also said that the kit was still sealed at that time. Deputy Kathy Verrett stated that she received the blood sample from Corporal Gillard, labeled it, and turned it over to Mr. Ieyoub for analysis. She also identified the kit at the hearing. She testified that she received the kit from Corporal Gillard at 8:44 a.m., December 15.
It therefore seems that the State proved the custodial chain of the blood alcohol kit from the time the blood was drawn to analysis. The testimony of Lt. Manning and Officer Houston showed that the kit was in their custody until it was placed in the LCPD's refrigerator. The kit was sealed by Lt. Manning and Dr. Pittman. Although the refrigerator was not locked, the kit was still sealed when picked up by Corporal Gillard for transportation to the Crime Lab. Further, the kit was identified by several of the officers in the chain of custody. The State showed by a preponderance *838 of the evidence that the kit was not tampered with from the time the blood was drawn until the sample was received by the Crime Lab.
Relator next argues that the State failed to prove that a replicate analysis was performed on the sample. Mr. Ieyoub testified that he performed replicate testing on Hebert's blood sample. Defense expert, Dr. Laga, however, stated that what was performed was "duplicate", and not replicate analysis because Mr. Ieyoub did not "start from scratch" in his replicate testing. Dr. Laga, however, offered no testimony as to which method is accepted by DPS. Mr. Ieyoub testified that his lab's written procedures have been approved by the Louisiana State Police and that his lab has passed the proficiency testing program required by La.Reg. § 563. Nothing in the regulations suggest that Mr. Ieyoub's method is incorrect. This argument is without merit.
Finally, relator argues that after we granted writs in this matter, it came to his attention that when DPS promulgated regulations on July 20, 1988, pertaining to the analysis of breath, it effectively repealed the blood alcohol testing regulations of June 20, 1988, which are the regulations discussed hereinabove. As authority for this position, relator relies upon the following preamble of the July 1988 regulations pertaining to the analysis of breath:
"In accordance with the provisions of the Administrative Procedure Act (R.S. 49:950 et seq.) and R.S. 32:663, notice is given that the secretary of The Department of Public Safety and Corrections adopted the following rules and regulations governing the analysis of blood and breath to determine the alcoholic content. These promulgations supercede all previous regulations and therefore upon final acceptance and publication should be considered as the only rules in effect relating to alcohol analysis in accordance with R.S. 32:663."
14 Louisiana Register, No. 7, 441 (July 20, 1988).
Relator argues that the new regulations found in 14 Louisiana Register, No. 7, at pages 441-444, July 20, 1988, do not mention blood alcohol analysis, but only analysis of breath. Therefore, there were no blood alcohol testing regulations in effect when relator's blood sample was drawn and analyzed in December 1988, thus the requirements of Rowell, supra, were not met. We disagree.
The last sentence of the preamble clarifies that "These promulgations supercede...." (Emphasis added.) The only regulations promulgated under this preamble pertained to the analysis of breath. Therefore, we find the preamble did not repeal the regulations for the analysis of blood promulgated June 1988.
For the foregoing reasons, the writ granted is recalled and denied. The ruling of the trial court denying the motion to suppress the results of the blood alcohol analysis is affirmed. Costs of this writ application is assessed to relator, Charles Terry Hebert.
WRIT RECALLED AND DENIED.
NOTES
[*] Judge Charles Wm. Roberts, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] LSA-R.S. 32:662(A)(1)(c) provides:

A. The chemical test or tests as provided for by this Part shall be subject to the following rules and shall be administered as provided for hereafter:
1. Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of alcoholic beverages the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of the person's blood, urine, breath or other bodily substance shall give rise to the following presumptions: ...
c. If there was at the time 0.10 per cent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages.